EXHIBIT A

DECLARATION OF F. GERARD HEINAUER

F. GERARD HEINAUER, pursuant to 28 U.S.C. § 1746, declares the following:

1.  I am employed by the Department of Homeland Security ("DHS"), Citizenship and Immigration Services Division ("USCIS"), as the Director of the Nebraska Service Center in Lincoln, Nebraska.  It is in that capacity and based upon reasonable inquiry and my knowledge, information and belief that I provide this declaration.

2.  The Secretary of the Department of Homeland Security is a named defendant in the case Ping Jiang v. Chertoff, et al., 07-03909, presently pending in the United States District Court for the Northern District of California.  Plaintiff is a citizen of the People's Republic of China assigned alien registration number A97 888 130, who seeks to have his pending Form I-485, Application for Adjustment of Status, adjudicated.

3.  Plaintiff filed his Form I-485 at the California Service Center on November 23, 2004, through a California attorney of record who has not withdrawn from his representation of the alien before the agency. The Form I-485 was assigned receipt number WAC 05-040-52600.  Due to a shift in workloads at the Service Centers, Plaintiff's application was transferred to the

Nebraska Service Center on March 2, 2007, and remains
pending.

4.   Plaintiff's adjustment of status application is based
on an application for permanent employment
certification for a second preference professional
worker (advanced degree/exceptional ability) position
filed with the U.S. Department of Labor by Oracle
Corporation (Oracle), on November 29, 2004.  The U.S.
Department of Labor certified the position, thus
indicating that there are not sufficient U.S. workers
available to fill the position and that employment of a
qualified alien in the position described will not
adversely affect the wages and working conditions of
similarly-employed workers in the United States.  The
priority date for the labor certification, usually
established by the date the request was initially
accepted for processing, is February 13, 2002.

5.   The approved labor certification was filed with USCIS
along with a Form I-140 immigrant visa petition for
alien worker on November 29, 2004, by Oracle, on behalf
of Plaintiff.  The visa petition was approved May 26,
2005.  The goal of the I-140 and I-485 filings are to
obtain lawful permanent resident ("green card") status

for Plaintiff and any qualified dependent spouse or child through Plaintiff's employment.

6. In recognition of the fact that the relationship between the petitioning employer and alien may change due to the lengthy period of time it takes for USCIS to adjudicate an adjustment of status application, Congress passed the American Competitiveness in the Twenty-First Century Act of 2000 (Public Law 106-313)("AC21"). AC21 permits the alien worker to adjust status based on employment with a different employer than the company that filed the I-140 visa petition, if the job duties of the new employment are the same or similar to the occupational classification certified by the Department of Labor.

7. General requirements for employment-based adjustment of status applications are that the alien is the beneficiary of an approved I-140 visa petition (or is the spouse or child of an alien who has been granted employment-based adjustment of status), is in lawful immigration status, has a visa number immediately available under the annual per-country and preference category quota, and is not inadmissible to the United States under listed statutory grounds that include

health-related, criminal, and national security
provisions.

8.  Plaintiff's application for adjustment of status is
    ready to be adjudicated except that his background and
    security check has not been completed by the Federal
    Bureau of Investigation.  When Plaintiff's background
    check is completed, Plaintiff's case can be
    adjudicated.

9.  The attached Fact Sheet explains the different types of
    background and security checks relevant to the
    statutory requirement that the alien be admissible to
    the United States that must be completed prior to
    adjudication of Form I-485.

10. When an alien applies for adjustment of status, USCIS
    conducts several forms of security and background
    checks to ensure that the alien is eligible for the
    immigration benefit and that he or she is not a risk to
    national security or public safety.  In addition to
    records checks against DHS's own immigration systems,
    these background checks currently include (a) a Federal
    Bureau of Investigation (FBI) fingerprint check for
    relevant criminal history records on the alien (e.g.,
    arrests and convictions); (b) a check against the DHS-
    managed Interagency Border Inspection System (IBIS)

that contains records and "watch list" information from
more than twenty federal law enforcement and
intelligence agencies, such as the Central Intelligence
Agency (CIA), FBI, other divisions of the United States
Department of Justice, Department of State, DHS/U.S.
Customs and Border Protection (CBP), and other DHS
agencies (IBIS includes, but is not limited to,
information related to persons who are wanted or under
investigation for serious crimes or suspected of
terrorism-related activity); and (c) an FBI name check,
which is run against FBI investigative databases
containing information that is not necessarily revealed
by the FBI's fingerprint check or IBIS.

11. These law enforcement checks have revealed significant
derogatory information on various alien applicants for
immigration benefits, including applicants seeking
permanent residency, which has resulted in the alien
being found ineligible for the benefit and USCIS's
denial of the application.  Where applicable, the
information has also resulted in aliens being arrested
by law enforcement agencies or charged under removal
grounds and deported from the United States following a
final order of removal.  In many instances, the
disqualifying information on the alien has been

discovered as a result of the IBIS or FBI name checks, but it has not been revealed by a fingerprint check alone.

12. Since the terrorist attacks of September 11, 2001, the need to conduct more rigorous and thorough background checks on aliens who are seeking immigration status in the United States has required procedures that sometimes result in individuals not receiving their documents and benefits as quickly as in the past. In order to ensure national security and public safety, as well as to reduce the waiting time for adjudication and documentation of lawful status, USCIS is currently working with DOJ, DHS, and ICE to develop and implement improved procedures that will ensure that all of the background checks are completed and the results considered as quickly as possible. However, the public safety requires USCIS to make certain that the checks have been done before it adjudicates any application or petition and before it issues any immigration status documents to such persons.

13. USCIS will continue to perform any outstanding background and security checks as expeditiously as possible to help ensure that no eligible alien must wait longer than is reasonably necessary to receive a

decision on his or her application or petition and to receive evidence of his or her immigration status.

14. The fingerprint check must be less than fifteen months old at the time any application or petition is adjudicated. Plaintiff was fingerprinted on March 19, 2005 and September 28, 2006. Rescheduling of fingerprints is done to ensure that the fingerprint checks remain current and that the cases will be adjudication-ready once the security check is completed.

15. For Plaintiff's application, the preliminary IBIS checks have been completed. Remaining IBIS checks are performed by the officer at the time of final adjudication if deemed necessary.

16. Since 9/11, USCIS has submitted millions of name check requests to the FBI, thus taxing that agency's resources and creating a backlog in FBI's performance of complete security checks.

17. Plaintiff's name check request was electronically submitted to the FBI on December 3, 2004, less than two weeks after his Form I-485 was filed. The FBI electronically acknowledged receipt of the name check request on December 9, 2004. The name check remains pending.

18. There are five USCIS regional Service or Benefit Centers throughout the United States, each of which has jurisdiction over certain applications and petitions filed by persons or companies within its respective geographic jurisdiction, and/or exclusive nationwide jurisdiction over other types of applications. These Centers adjudicate cases on a mail-in basis only; they do not conduct in-person interviews. Employment-based adjustment of status cases like Plaintiffs' are handled at the Nebraska and Texas Service Centers.

19. By statute, only about 140,000 aliens and their derivative relatives can get green cards through employment-based categories during each fiscal year, with percentage limits set by Congress per country and within each preference category. China, India, Mexico, and the Philippines are frequently oversubscribed, and numbers are generally more available in the first and second employment-based preferences (aliens of extraordinary or exceptional ability and advanced degree professionals) than in the third preference (skilled workers with 2 years of experience or training and professionals with a baccalaureate degree).

20. Unused visa numbers under the annual quota do not carry over from one fiscal year to the next. Every attempt

is made to maximize number use under the annual
numerical limit.  These visa numbers are tracked and
issued by the Department of State.  The priority date
for visa number purposes in Plaintiff's case is the
date of filing the labor certification:  February 13,
2002.

21. The Nebraska Service Center currently has approximately
73,135 employment-based Form I-485 adjustment of status
cases pending, about 17,741 of which are still awaiting
completion of FBI name checks before they can be
adjudicated.  Of an additional 81,970 (estimated)
pending asylum/refugee-base Form I-485 adjustment of
status cases, there are approximately 10,340 awaiting
responses on FBI name checks.  Of a total figure of
84,355 naturalization filings being processed at the
Nebraska Service Center, there are approximately 21,728
awaiting responses on FBI name checks.  Cases in which
the pending FBI name check is the only impediment to
final adjudication are audited on a weekly basis in
order to identify those in which a response from the
FBI has been received.  Once the security checks are
completed, the case can be evaluated for visa number
availability.

22. Service Centers have a process for expediting
    processing of certain applications and petitions.
    However, it is important to note that whenever a
    particular application or petition receives expedited
    processing and is moved up in the adjudications queue,
    it is at the expense of those still unadjudicated
    petitions or applications that bear an earlier filing
    date.  If, for example, USCIS asks the FBI to expedite
    a case, this action comes at the expense of other name
    check cases, many of which have been pending since
    December 2002, because FBI would have fewer resources
    with which to work the other pending cases.  USCIS is
    currently limited in the number of expedite requests
    that can be made to the FBI each week, and there is a
    backlog even in submitting the expedite requests for
    cases that have been deemed to meet expedite criteria.

23. In order to address in a consistent and fair manner the
    increasing number of mandamus actions filed nationwide
    by aliens awaiting decisions on their petitions and
    applications, USCIS issued specific guidelines for
    requesting an expedited name check from the FBI.
    Expedited processing may be pursued in cases at USCIS's
    discretion for military deployment, age-out cases and
    applications affected by sunset provisions, significant

and compelling reasons such as critical medical
conditions, loss of social security benefits or other
subsistence, severe financial loss, extreme emergent
situation, humanitarian situation, nonprofit status of
requesting organization in furtherance of the cultural
and social interest of the United States, Department of
Defense/National Interest requests from official U.S.
government entity, USCIS error, or compelling interest
of USCIS.

24. On October 10, 2007, USCIS initiated a request to the
FBI for an expedited name check.  Expedite requests are
determined on a case-by-case basis.  Plaintiff states
in his complaint that he wishes to have his green card
quickly because he has "been damaged" regarding his
immigration status in the United States.  This is a
common reason for aliens to desire lawful permanent
resident status and does not generally, as a single
factor, constitute a special circumstance that would
justify emergency or expedited processing.  Other
common reasons include inability of non-lawful
permanent residents or non-U.S. citizens to:  work
without restriction, acquire time for naturalization
eligibility, get grant funds for research, apply for
desirable jobs, qualify for scholarships or

fellowships, or get in-state tuition for self, spouse or dependents.

25. Another common factor in the many mandamus lawsuits filed against USCIS and involving pending FBI name checks are the plaintiffs' claims that they made repeated status inquiries about their case to USCIS, FBI, Congress, and the White House. While multiple status inquires show the applicants' frustration with the pace of the processing of their applications, the inquiries, and mandamus actions, increase the workload of the FBI or USCIS, rather than having the effect of faster or special treatment of the subject applications.

26. Most applicants for adjustment of status may apply for and be granted (usually in one-year increments) work authorization documents and advance parole documents to enable them to travel abroad while their application is pending. Incident to his status as a pending adjustment applicant, Plaintiff currently holds a work authorization document permitting him to work for any employer he wishes valid through February 6, 2008. In addition, Plaintiff filed an application for an advance parole travel document to allow for travel abroad on

September 12, 2007.  Plaintiff's application for a travel document remains pending.

27. The Nebraska Service Center is processing Mr. Jiang's adjustment of status application in accordance with standard procedures.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Lincoln, Nebraska
on this 31st day of October, 2007.

F. Gerard Heinauer
Director
Nebraska Service Center

*Press Office*
**U.S. Department of Homeland Security**



April 25, 2006

# Fact Sheet

## Immigration Security Checks—How and Why the Process Works

**Background**

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

**Why USCIS Conducts Security Checks**

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

**How Immigration Security Checks Work**

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny. USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—** IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case. Results of an IBIS check are usually available immediately. In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications. The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations). In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications. The FBI name check is totally different from the FBI fingerprint check. The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks. In about 80 percent of the cases, no match is found. Of the remaining 20 percent, most are resolved within six months. Less than one percent of cases subject to an FBI name check remain pending longer than six months. Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. Most cases proceed forward without incident. However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable. Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

---

several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

Ping Jiang               )

        Plaintiff,     )

        )

        v.         )    Case No: C 07-03909 CRB

Alberto Gonzales, Attorney General of the   )

United States,      )

       et al.,      )

        )

        Defendants,   )

        )

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program Section ("NNCPS") at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for Ping Jiang, the plaintiff in this civil action.

# NATIONAL NAME CHECK PROGRAM

(4)     The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies.  The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration.  That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees.  The FBI performs the primary National Agency Check conducted on all United States Government employees.  From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa.  More than 70 federal, state, and local agencies regularly request FBI name searches.  In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)     The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

2

compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)    FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

(7)    Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)    The entries in the General Indices fall into two categories:

(a)    "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

(b)    "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)    In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system

3

consists of the following three automated applications that support case management functions

for all investigative and administrative cases:

(a)  Investigative Case Management:  This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads.  A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed.  The offices that receive the leads are referred to as Lead Offices.  When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation.  Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

(b)  Electronic Case File:  This application serves as the central electronic repository for the FBI's official text-based documents.  It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the computerized system.  All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c)  Universal Index:  This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases.  Only the Office of Origin is required to index.  However, the Lead Offices may index additional information as needed.  The Universal Index, which consists of an index of approximately 99.2 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases.  Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

4

(10)   The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve one of the mandated missions of the FBI, to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)   When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program

5

application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

     (12)   If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a close date of birth or social security number, it is designated an "Ident."

## <u>RESOLUTION RATE</u>

     (13)   There are four stages involved in the completion of an individual name check: batch processing, name searching, file review, and dissemination. The first stage in the process, batch processing, involves the transfer of the name check requests from USCIS to the NNCPS on magnetic tapes. Each tape can hold up to 10,000 names. (Some requests are transmitted via facsimile or verbally via telephone.) The tapes are uploaded into an FBI system and the names are electronically checked against the FBI's Universal Index (UNI). Historically, during the batch processing phase, approximately 68 percent of the name checks submitted by USCIS are returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. Duplicate submissions (<u>i.e.</u>, identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

     (14)   The second stage in the process is name searching. For the name check requests that are still pending after the initial electronic check, additional review is required. An

FBI employee in the NNCPS physically enters the applicant's name into the computer database searching different fields and information. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS.

(15)    The third and fourth stages in the process are file review and dissemination. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(16)    Additional searches against the FBI's Universal Index, additional manual name searches, and/or additional file review of a name check request, depending on the length of time a name check request is pending in the processing queue, may occur periodically during the name check process to ensure that stale information is updated.

(17)    Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

7

(18)    At each stage of processing, the NNCPS generally works on the oldest name checks first – a first-in, first-served protocol. This protocol reflects that all applicants are equally deserving and ensures that all applicants are treated fairly. However, if an applicant's name check requires a review of numerous FBI records and files, even though that person came in first, the name check may require additional time until all responsive records are located and reviewed.

(19)    The general exception to the first-in, first-served policy exists when USCIS directs that a name check be handled on an "expedited" basis. USCIS determines which name checks are to be expedited based on criteria it determines. Once designated as an "expedite," that name check proceeds to the front of the queue along with other prioritized name check requests, in front of the others waiting to be processed.

(20)    Another exception to the first-in, first-served policy is a near-term effort agreed to by USCIS and the FBI to reduce the number of pending USCIS name check requests by prioritizing "single hit" name checks. This key initiative is explained in paragraph (33) below.

## GROWTH OF THE NAME CHECK PROGRAM

(21)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

(22)    A significant portion of the incoming name checks submitted over the past few years has been submitted by USCIS. In fiscal year 2003, 64% (approximately 3,929,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% (~1,727,000)

8

of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45%

(~1,512,000) of the total incoming name checks were submitted by USCIS; and in fiscal year

2006, 45% (~1,633,000) of the total incoming name checks were submitted by USCIS.

## USCIS NAME CHECK REQUESTS

(23)     In November 2002, heightened national security concerns prompted a

review of the former Immigration and Naturalization Service's ("INS's") procedures for

investigating the backgrounds of individuals seeking immigration benefits. It was determined

that deeper, more detailed clearance procedures were required to protect the people and the

interests of the United States effectively. One of the procedures identified was the FBI's name

check clearance. Before November 2002, only those "main" files that could be positively

identified with an individual were considered responsive to the immigration authorities name

check requests. However, because that approach ran a risk of missing a match to a possible

derogatory record, the FBI altered its search criteria to include "reference" files as well. From a

processing standpoint, this meant the FBI was required to review many more files in response to

each individual background check request.

(24)     In December of 2002 and January of 2003, the former INS resubmitted 2.7

million name check requests to the FBI for background investigations of all individuals with

then-pending applications for immigrations benefits for which the Immigration and Nationality

Act required background investigations. Those 2.7 million requests were in addition to the

regular submissions by the former INS. Currently, the FBI has returned an initial response to all

2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to

those resubmitted requests indicated that the FBI had no information relating to the specific

9

individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI is still in the process of resolving those 440,000 requests. Currently, less than 6,300 of those resubmitted requests remain pending.

(25)  The FBI's processing of the more than 440,000 residuals has delayed the processing of regular submissions from USCIS. A dedicated team within NNCPS has been assigned to handle only these re-submitted name check requests. To the extent that the team members are working on only these applications, they are unavailable to process the normal submissions.

(26)  There are numerous factors that have contributed to delays in the processing of name check requests. One is the volume of incoming name checks – the total volume of incoming name check requests combined with pending name check requests has historically outpaced the NNCPS's available resources to process this volume. As it concerns submissions by USCIS, for Fiscal Year 2006, USCIS submitted approximately 1,633,000 name check requests, of which approximately 718,000 represented naturalization-related name checks and approximately 658,000 represented adjustment of status-related name checks. As of the end of Fiscal Year 2006, the NNCPS had over 364,600 pending USCIS name check requests, of which over 157,300 represented naturalization-related name checks and over 157,800 represented adjustment of status-related name checks.

(27)  The number of "hits" on a name when it is reviewed may further contribute to a delay in processing a name check request. A "hit" is a possible match with a

10

name in an FBI record. The number of times the name appears in FBI records correlates to the number of records which require review.

(28)    The processing of common names also contributes to a delay in processing a name check request. The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on. Without detailed information in both the file and agency submission, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records. Common names can often have more than 200 hits on FBI records.

(29)    The accessibility of the FBI record needed for review also contributes to a delay in processing a name check request. If the date of the record predates October 1995, the paper record has to be located, retrieved, and reviewed; if the date of the record is later than October 1995, the record text may or may not be available electronically depending on the type of record and whether it has been uploaded electronically. A paper record could be at one of over 265 possible locations across the country. Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices. One person's name check may involve locating and reviewing numerous files, all at different physical locations. Each request must be communicated internally from the NNCPS to the field, and handled according to the current priorities of the particular field office. Since it is a paper based process, it is a process subject to misplaced or misfiled files. The process is time consuming and labor intensive.

11

(30)     Another contributing factor which was briefly mentioned earlier in this declaration is the expedited request. Processing an expedited case means that an employee is not available to work on a normal name check request.

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(31)     The FBI is seeking a number of improvements to its process. Over the short-term:

(32)     NNCPS is continuing to develop the Name Check Dissemination Database ("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate preparation of reports to other Agencies, and provide avenues for future automation of the name check process.

(33)     NNCPS is partnering with other Agencies to provide contractors and personnel to process name checks. For example, the FBI and USCIS have implemented a key initiative to use contractor resources to prioritize the processing of "Single-Hit" USCIS Name Check requests, that is, pending name check requests that have only one FBI file potentially identified with it that needs to be reviewed in order to process the request. By applying contractor resources to process these "Single Hit" requests, the FBI may significantly reduce the pending USCIS name check workload.

(34)     The FBI is in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee

12

can begin to significantly impact the NNCPS workload. These efforts have led to the development of a name check employee training manual.

(35)   NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database. It is also building an Electronic Records System that allows for future automation of the name check process.

(36)   NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(37)   As a mid-term improvement, NNCPS is exploring technology updates to the name check process. Specifically, the FBI procured textual analysis software in order to investigate ways to further automate the name check process. The goal is to incorporate analytical software applications that reduce the time spent to verify the identity of the individual and, once verified, assists in the adjudication analysis. This type of automation should decrease the time required to process a name check, thereby increasing production. The FBI is building a proof of concept system for eventual integration into the FBI's core databases.

(38)   As a long-term improvement, the FBI is developing a Central Records Complex that will create a central repository of records. Currently, paper files/information must be retrieved from over 265 locations throughout the FBI. The Central Records Complex will address this issue, creating a central repository-scanning of documents, and expediting access to information contained in billions of documents that are currently manually accessed in locations around the United States and world. In addition, the essential long term improvement for FBI Name Checks is to adjust the fee schedule to reflect the actual cost of providing name check

13

services. Once in place, the FBI will be able to scale resources proportionally with workload

demands – pending name checks will pay for themselves. At this time fees do not cover the

basic costs of providing the service. Therefore, the FBI cannot adequately apply resources to

processing name checks without pulling critically needed personnel and funding from other

programs. The FBI procured services to conduct a study to determine an appropriate fee

structure. This study is in its final phase.

(39)    For the reasons stated earlier, the FBI cannot provide a specific or general

time frame for completing any particular name check submitted by USCIS. The processing of

name checks, including those which are expedited at the request of USCIS, depends upon a

number of factors, including where in the processing queue the name check lies; the workload of

the analyst processing the name check; the volume of expedited name checks the analyst must

process for, among others, military deployment, "age-outs," sunset provisions such as Diversity

Visa cases, compelling reasons such as critical medical conditions, and loss of Social Security or

other subsistence; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed

and resolved; the number of records from various Field Offices that must be retrieved, reviewed

and resolved; and, more generally, the staff and resources available to conduct the checks.

Unfortunately, the proprietary software NNCPS utilizes to process name checks does not report

where in the processing queue a particular name check request may lie vis-à-vis other name

checks. Additionally, until review of each case is undertaken no estimate for the time required to

complete it can even be attempted, no estimate can be made as to when the plaintiffs' cases will

be reached by NNCPS staff, nor can any reliable estimate be made as to how long it will take to

complete the review once it has begun. While the FBI is sensitive to the impact of the delays in

14

processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When the name check is completed, the FBI provides the results to USCIS as quickly as possible.

(40)    It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

## PLAINTIFF'S NAME CHECK REQUEST

(41)    The name check request for plaintiff Ping Jiang was received by the FBI from USCIS on or about December 9, 2004 and has not been completed. The FBI is performing its check in response to USCIS's request in accordance with the procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(42)    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this **24th** day of September 2007.


MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

15